IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BISA A. BROGDON,
    Plaintiff,

v.

GRADY MEMORIAL HOSPITAL
CORPORATION, et al.,
    Defendants.

CIVIL ACTION NO.
1:22-cv-4512-CMS

## OPINION AND ORDER

Plaintiff Bisa A. Brogdon brings this employment discrimination action against Defendants Grady Memorial Hospital Corporation ("Grady"), Timothy Jefferson, and John Haupert pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and 42 U.S.C. § 1981. She asserts causes of action for race discrimination, sex discrimination, and retaliation. This matter is before the Court on Defendants' Motion for Summary Judgment [Doc. 137] and Defendant Grady's Motion in Limine [Doc. 138]. On March 19, 2025, the Court held a hearing on the Motion in Limine. For the reasons below, the Court will grant in part the Motion in Limine and grant the Motion for Summary Judgment.

## I.  PROCEDURAL BACKGROUND

On October 14, 2022, Brogdon filed this lawsuit in the Fulton County Superior Court against Grady, Fulton-DeKalb Hospital Authority d/b/a Grady

Hospital, and two individuals—Jefferson (Grady's General Counsel) and Haupert (Grady's President and Chief Executive Officer). [Doc. 1-2]. On November 14, 2022, the case was removed to this Court. [Doc. 1]. On December 12, 2022, Brogdon filed a First Amended Complaint for Damages and Equitable Relief (the "First Amended Complaint"), naming only Grady, Jefferson, and Haupert as defendants. [Doc. 6, Am. Compl.].

Brogdon alleges the following causes of action in the First Amended Complaint:

- race discrimination in violation of Title VII against Grady (Count One);

- sex discrimination in violation of Title VII against Grady (Count Two);

- retaliation in violation of Title VII against Grady (Count Three);

- race discrimination under 42 U.S.C. § 1981 against all Defendants (Count Four); and

- retaliation under 42 U.S.C. § 1981 against all Defendants (Count Five).

The parties consented to jurisdiction before a United States Magistrate Judge. [Doc. 17].

Following extensive discovery, Defendants filed the pending Motion for Summary Judgment. [Doc. 137]. Defendant Grady also filed a Motion in Limine. [Doc. 138]. Both motions have been fully briefed by the parties and are ripe for

resolution.  Because the resolution of the Motion in Limine impacts the analysis of the summary judgment motion, the Court first will address the Motion in Limine.

## II.  <u>MOTION IN LIMINE</u>

Bisa Brogdon previously worked as Senior Associate General Counsel at Grady.  Timothy Jefferson, Grady's General Counsel, was her supervisor.  While Brogdon was still employed at Grady, Jefferson asked Brogdon to review and provide grammatical feedback on a memorandum that he prepared to rebut a negative performance evaluation that he received in 2018 from Grady's Chief Executive Officer, John Haupert.  The memorandum, dated April 16, 2019, was addressed to Grady's Chairman of the Board, Frank Blake, and to Haupert.  It is undisputed that portions of the memorandum captured legal opinions and advice that Jefferson had previously provided to Grady executives regarding various organizational initiatives and actions.  The memorandum was marked **"PRIVILEGED AND CONFIDENTIAL"** and **"ATTORNEY-CLIENT PRIVILEGED."**  In addition to sharing the memorandum with Brogdon, Jefferson shared the memorandum with his personal lawyer.  Brogdon later shared the memorandum with her personal lawyers, and Brogdon seeks to rely on the memorandum in this litigation.

3

Grady moves the Court for an order that precludes Brogdon from relying upon the portions of the memorandum that Grady has redacted[1] and contends are privileged for any purpose in this case, including to oppose Defendant's Motion for Summary Judgment.[2] Grady argues that the Court should grant this relief because these portions of the document are (1) protected by the attorney-client privilege, (2) irrelevant, and/or (3) unfairly prejudicial. [Doc. 139-1 at 1].

## A.    Standard of Review

"The Court will grant a motion in limine to exclude evidence only if the evidence in question is clearly inadmissible. The moving party has the burden of proving that the evidence sought to be excluded is inadmissible." *Wilson v. Pepsi Bottling Grp., Inc.*, 609 F. Supp. 2d 1350, 1359 (N.D. Ga. 2009) (internal citation omitted). Among other grounds for excluding evidence, a court may exclude evidence that is irrelevant. FED. R. EVID. 402. A court may also exclude evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." FED. R. EVID. 403. However, "[b]ecause it allows a trial court to exclude

---

[1] Grady has provided both redacted and unredacted versions of the memorandum. [Docs. 139-2 and 139-3].

[2] Grady explains that it filed the instant motion because the attorney-client privilege on which the motion is based belongs to Grady. Grady states, however, that Defendants Jefferson and Haupert support the motion. [Doc. 139 at 1 n.1].

evidence that is probative, Rule 403 is 'an extraordinary remedy which should be used sparingly' [and] the balance should be struck in favor of admissibility." *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2014) (citation omitted).

### B.    Attorney-Client Privilege

Because Brogdon's claims in this case arise under federal statutes, federal law controls attorney-client privilege issues.  *Garner v. Wolfinbarger*, 430 F.2d 1093, 1098 (5th Cir. 1970); *see also* FED. R. EVID. 501.  However, the values long embodied in policies of the state remain important, and "a federal court must take full account of the reasons for any asserted privilege including any especially strong policies of the state in which the court sits." *Garner*, 430 F.2d at 1100.

The attorney-client privilege is "'the oldest of the privileges for confidential communications known to the common law.'" *United States v. Zolin*, 491 U.S. 554, 562 (1989) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  "The attorney-client privilege exists to protect confidential communications between client and lawyer made for the purpose of securing legal advice." *In re Slaughter*, 694 F.2d 1258, 1260 (11th Cir. 1982).  "The protection afforded by the attorney-client privilege promotes full and frank communications between an attorney and client in order to facilitate the maximum effectiveness of the attorney's

representation." *In re Grand Jury Matter No. 91-01386*, 969 F.2d 995, 997 (11th Cir. 1992) (citing *Upjohn*, 449 U.S. at 389). It is well-settled law that the attorney-client privilege applies to communications between in-house corporate counsel and the corporation's management and employees. *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 1:04-cv-3066-JEC, 2006 WL 8411781, at *2 (N.D. Ga. Feb. 27, 2006); *St. Simons Waterfront, LLC v. Hunter, Maclean, Exley & Dunn, P.C.*, 746 S.E.2d 98, 103 (Ga. 2013).

The burden of establishing that a particular communication is protected by the attorney-client privilege rests with the party asserting the privilege. *In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1225 (11th Cir. 1987) (citations omitted). The party must prove that (1) an attorney-client relationship existed, (2) a confidential communication was made to or from (3) an attorney who had been retained for the purpose of securing legal advice or assistance. *Meade v. Gen. Motors, LLC*, 250 F. Supp. 3d 1387, 1391 (N.D. Ga. 2017) (citing *U.S. v. Schaltenbrand*, 930 F.2d 1554, 1562 (11th Cir. 1991)). That party also must show that the claim of privilege has been asserted and has not been waived. *United States v. Davita, Inc.*, 301 F.R.D. 676, 680 (N.D. Ga. 2014).

To determine if a particular communication is confidential and protected by the attorney-client privilege, the privilege holder must prove the communication was

"(1) intended to remain confidential *and* (2) under the circumstances was *reasonably* expected and understood to be confidential." *United States v. Bell*, 776 F.2d 965, 971 (11th Cir. 1985) (per curiam) (emphasis in original). "The attorney client privilege applies only to confidential communications between an attorney and client which relate to obtaining legal advice [and] attaches to communications from the attorney to the client as well as the reverse." *Shipes v. BIC Corp.*, 154 F.R.D. 301, 304 (M.D. Ga. 1994) (citation omitted).

Courts generally apply the "primary purpose" test to determine whether a communication is privileged. *United States ex rel. Bibby v. Wells Fargo Bank, N.A.*, 165 F. Supp. 3d 1319, 1329 (N.D. Ga. 2015) (citations omitted). The Court "asks whether 'obtaining or providing legal advice [was] *a* primary purpose of the communication, meaning one of the significant purposes of the communication.'" *Ramb v. Paramatma*, No. 2:19-cv-21-RWS, 2021 WL 5038756, at *3 (N.D. Ga. Sept. 22, 2021) (quoting *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759–60 (D.C. Cir. 2014) (italics and alteration in original)). "'The attorney-client privilege protects only the disclosure of confidential communications. It does not protect the disclosure of the underlying facts by those who communicated with the attorney.'" *Id.* at *4 (quoting *Abdallah v. Coca-Cola Co.*, No. CIV A1:98cv3679RWS, 2000 WL 33249254, at *2–4 (N.D. Ga. Jan. 25, 2000)).

"The primary purpose doctrine can focus on the communication as a whole or on segregable portions of communications if the proponent chooses to redact rather than make a universal claim." *In re Vioxx Prods. Liability Litig.*, 501 F. Supp. 2d 789, 802 n.22 (E.D. La. 2007) (citing Paul R. Rice, 1 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 7:8, pp. 59–62 (Thomson West 2d ed.1999) (hereinafter "RICE")). "When the primary purpose of a document or communication is not to provide legal advice, yet legal advice is included, then the legal advice is privileged only if it can be severed from the [document] itself." *Chabot v. Walgreens Boots Alliance, Inc.*, No. 1:18-cv-2118, 2020 WL 3410638, at *4 (M.D. Pa. June 11, 2020) (citing RICE § 7:3). "'The burden is on the privilege proponent to differentiate the legal from the nonlegal.'" *Id.* (quoting RICE § 7:3). "When legal advice is excised from the document, each excised comment is independently judged as to its legal nature." *Id.* (citing *In re Vioxx Prods. Liability Litig.*, 501 F. Supp. 2d at 802). If legal advice is not excised from the document, the proponent of the privilege must establish that the primary purpose of the entire document or communication is legal in nature. *Id.* (citing *Kramer v. Raymond Corp.*, Civ. No. 90–5026, 1992 WL 122856, at *1 (E.D. Pa. May 29, 1992)).

### 1. Legal Nature of Redacted Information

Here, Grady is not asserting that the entire memorandum is protected from disclosure by the attorney-client privilege. [Doc. 139-1 at 10]. Rather, Grady's position is that the redacted portions of the memorandum reflect Jefferson's prior legal advice and opinions and that those redacted portions retain their privileged status, even though the legal advice and opinions were repeated in a document that Jefferson drafted and distributed not to provide legal advice but to challenge his performance appraisal. [*Id.* at 10–11]. Grady maintains that the focus should be on the intent and purpose of the initial communication, and Grady urges that the "subsequent reference to that legal advice in another document does not result in forfeiture by the client of the communication's initial privileged nature." [*Id.* at 11]. I agree with Grady's arguments.

At her deposition, Brogdon, a seasoned attorney, conceded that the memorandum contained "legal opinions and thoughts . . . that could be construed as privileged information." [Doc. 126-1, Deposition of Bisa Brogdon "Brogdon Dep." at 317; *see also id.* at 301, 311–13]. Despite this testimony, Brogdon now claims that nothing in the memorandum is protected by the attorney-client privilege. [Doc. 148 at 1–3].

Attorney-client communications contained in a document that is otherwise not privileged in its entirety are nevertheless protected by the attorney-client privilege where those communications memorialize or repeat prior legal advice or reflect the substance of legal advice. For example, redacted portions of corporate minutes that contain legal advice and opinions are privileged and protected from disclosure. *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 475 (N.D. Tex. 2004); *see also Jo Ann Howard & Assocs., P.C. v. Cassity*, No. 4:09CV01252 ERW, 2018 WL 3861330, at *2 (E.D. Mo. Aug. 14, 2018) ("The parts of these documents that discuss litigation and legal advice are protected by attorney-client privilege but any other issues discussed in the minutes are not protected and must be disclosed."). Likewise, redacted portions of documents that reflect confidential legal advice from in-house corporate counsel to company employees or that reflect discussions of legal advice by company employees are protected by the attorney-client privilege. *A & R Body Specialty and Collision Works, Inc. v. Progressive Cas. Ins. Co.*, 07 CV 929, 2013 WL 6044342, at *4 (D. Conn. Nov. 14, 2013). As Grady argues, although the primary purpose of legal billing records is not to provide legal advice, attorney-client communications described in those records are themselves privileged. *Avery Outdoors LLC v. Outdoors Acquisition Co.*, No. 16-cv-2229-SHL-tmp, 2016 WL 10519113, at *4 (W.D. Tenn. Nov. 30, 2016) ("While legal billing records are

generally not privileged, such records may be covered by the privilege to the extent they reveal litigation strategy, a client's motive in seeking representation, or the specific, rather than the general, nature of the legal services the attorney rendered.").

During the hearing on the Motion in Limine, the Court reviewed each of Grady's redactions, heard from the parties regarding their respective positions on each redaction, and made rulings on the record as to what information in the memorandum was legal and nonlegal. The Court directed counsel for Grady to file a revised redacted memorandum consistent with my rulings, and Grady filed that revised redacted memorandum on March 21, 2025. [Doc. 168-1]. The Court finds that the redactions in this filing are legal in nature insofar as they memorialize legal opinions and advice that Jefferson had given to Grady's executives regarding proposed job-leveling initiatives, reorganizations, restructurings, and other employment decisions. Therefore, the redacted information is protected by the attorney-client privilege.

## 2. Waiver of Attorney-Client Privilege

"The attorney-client privilege 'belongs solely to the client,' and the client may waive it, either expressly or by implication." *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1417 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) (citation omitted). A client may waive the privilege by disclosing its

otherwise privileged communications to a third party. *See, e.g., United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987) ("[A]t the point where attorney-client communications are no longer confidential, i.e., where there has been a disclosure of a privileged communication, there is no justification for retaining the privilege. For that reason, it has long been held that once waived, the attorney-client privilege cannot be reasserted." (citations omitted)).  Moreover, when a client testifies about portions of attorney-client communications, "fairness . . . requires production of the remainder." *In re von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987).  The Eleventh Circuit has explained that "the doctrine of waiver by implication reflects the position that the attorney-client privilege 'was intended as a shield, not a sword.'" *Cox*, 17 F.3d at 1417 (quoting *GAB Bus. Servs., Inc. v. Syndicate 627*, 809 F.2d 755, 762 (11th Cir. 1987)).  Thus, a party also "waives the [attorney-client] privilege if it injects into the case an issue that in fairness requires an examination of otherwise protected communications." *Id.* at 1419.  The burden is on the proponent of the privilege to establish that no waiver has occurred.  *See United States v. Noriega*, 917 F.2d 1543, 1550 (11th Cir. 1990).

Brogdon argues that Grady has waived the attorney-client privilege in three ways.  First, Brogdon asserts that Jefferson waived the privilege when he shared the memorandum with Brogdon and his personal attorney to review.  [Doc. 148 at 3,

12–13].  Next, Brogdon asserts that Haupert, Grady's CEO, waived the privilege during his deposition when he provided testimony regarding the legal opinions that Jefferson included in the memorandum.  Brogdon finally contends that Grady waived the attorney-client privilege during the litigation of this case by relying on the memorandum to support its defenses in the case and by disclosing substantive information about the memorandum in its briefs supporting the Motion for Summary Judgment and the Motion in Limine.  [*Id.* at 13–14].  I will address each of these arguments in turn.

Jefferson did not waive the attorney-client privilege because the privilege was not his to waive.  When Jefferson provided his legal advice and opinions to the Grady executives, the privilege attached to that information and thereafter the privilege belonged solely to Grady.  Jefferson's subsequent actions in his individual capacity could not waive Grady's privilege.[3]  "[A]n attorney can neither invoke the privilege for his own benefit when his client desires to waive it nor waive the privilege without his client's consent to the waiver."  *Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551, 556 (2d Cir. 1967).  An attorney's disclosure of a privileged communication does not relinquish the privilege without the client's consent or

---

[3] It is undisputed that Jefferson drafted and disseminated the memorandum in his individual capacity.  [Doc. 148 at 1–2, 6, 10].

waiver. *In re von Bulow*, 828 F.2d at 100 (citation omitted). The privilege may only be waived if the client actually, or by conduct attributable to the client, consents to its disclosure. *See Suarez*, 820 F.2d at 1160–61 (holding that where client permitted attorney to disclose communications the client waived the privilege). There are no facts in this case to indicate that Grady voluntarily disclosed a communication protected by the attorney-client privilege or consented to the disclosure of protected information. To the contrary, Grady was not involved in and did not consent to Jefferson's disclosure of the memorandum to his personal attorney or to Brogdon.[4] Therefore, there was no waiver of the attorney-client privilege by Jefferson, and the legal opinions that Jefferson originally provided in his capacity as Grady's General Counsel, which he simply repeated in the memorandum, retained their privileged status.

The Court likewise rejects any argument that Grady, by its actions or inactions after learning of the memorandum's disclosure, waived the attorney-client privilege by implication. Grady argues that it did not impliedly waive the attorney-client privilege following the disclosure of the memorandum to third parties because as

---

[4] Brogdon testified that when she reviewed the memorandum for typographical and grammatical errors at Jefferson's request, she was not acting in an attorney role. [Brogdon Dep. at 297, 299]. Nevertheless, as a fellow attorney for Grady, Brogdon was not a privilege breaker.

soon as Grady learned that Brogdon had disclosed the memorandum to her attorneys, Grady objected to that disclosure on grounds of attorney-client privilege and demanded that Brogdon and her counsel immediately return the memorandum and destroy any copies of the memorandum in their possession. [Doc. 139-1 at 12–13]. Grady has attached as an exhibit to the Motion in Limine the letter that it sent to Brogdon's then attorney, which confirms the action Grady took upon learning of the disclosure.[5] [Doc. 139-5]. In these circumstances, there is no waiver of the attorney-client privilege. *See Harris v. Hyundai Mfg. Ala., LLC*, No. 2:19-cv-919-MHT-KFP, 2020 WL 13005140, at *2 (M.D. Ala. Dec. 23, 2020) (finding that there was no basis to rule that the defendant waived any privilege with respect to document that former employee submitted to the Equal Employment Opportunity Commission because

---

[5] During the hearing on the Motion in Limine, the Court asked Defendant Grady whether Grady also demanded that Jefferson's personal attorney return the memorandum and destroy any copies of it. Defense counsel represented that he did not believe Jefferson's personal attorney ever had a copy of the memorandum. Jefferson, who was present at the hearing, confirmed that he showed the memorandum to his personal attorney, but his personal attorney did not retain a copy of it. In any event, Brogdon did not argue that Grady might have waived the privilege by its conduct after Grady learned that Jefferson had sought legal advice from his personal attorney about the memorandum. Moreover, at the hearing where the Court raised the issue, Brogdon's counsel did not request that Jefferson be required to swear under oath to the fact that his counsel did not retain a copy of the memorandum.

defendant did not disclose the document and defendant objected to the document's disclosure).

Next, the Court finds that Grady's CEO, Haupert, did not waive Grady's attorney-client privilege when he testified about Jefferson's legal opinions concerning the personnel actions discussed in the memorandum. As an initial matter, the Court notes that Brogdon raised this argument for the first time at the March 19th hearing. Nevertheless, after considering the parties' oral arguments and reviewing what the record reflects regarding the parties' agreements concerning deposition testimony about the memorandum, the Court finds no basis to conclude that Haupert waived the privilege. During Jefferson's deposition, Brogdon's counsel sought to ask Jefferson questions about his memorandum, which Brogdon and her attorneys already had in their possession, notwithstanding the parties' disagreement at the time regarding whether the memorandum or certain portions of the memorandum were privileged and could be used by Brogdon in this litigation. Counsel for Defendants interjected, stating:

> Before you ask that, this document has been marked as confidential, and there are—the document has a number of attorney-client opinions in it, and we want to make sure that those—when we get the transcript

back, that there's adequate protection from disclosure of the attorney-client communications that are referenced in the document.

[Doc. 130-1, Deposition of Timothy Jefferson "Jefferson Dep." at 160]. Brogdon's

counsel responded:

> Okay. And I believe we're—we're under protective order that should govern it, and we'll double-check with the court reporter. Of course we challenge that the document in its entirety is protected by attorney-client privilege. Clearly, some of it has to do with counsel specific employment and his specific issues and allegations with regard to employment. But you're—you know, we got no beef, you know, with . . . the court reporter making sure they're compliant with the protective order as it stands . . . until such time as we challenge it.

[*Id.* at 160–61]. With that understanding, Brogdon's counsel continued with her

questions of Jefferson. [*Id.* at 161]. Near the beginning of Haupert's deposition,

counsel for Defendants asked Brogdon's counsel whether they could "have the same

stipulations [they] had with Mr. Jefferson's deposition about sealing certain

testimony if it becomes something that might be privileged." [Doc. 129-1,

Deposition of John Haupert "Haupert Dep." at 9]. Brogdon's counsel responded,

"Absolutely." [*Id.*]. As was the case during Jefferson's deposition, counsel asked

Haupert questions about matters in Jefferson's memorandum, including some of

Jefferson's legal opinions. But all of this was permitted because the parties had an

understanding that the deposition transcripts would be sealed and that the parties

would later litigate whether any portions of Jefferson's memorandum were protected

by the attorney-client privilege. Given the parties' stipulations, the Court does not find that Haupert waived the attorney-client privilege.

Finally, I am not persuaded by Brogdon's arguments that Grady has relied on the redacted information in the memorandum to support its defenses in this case and that Grady has waived the attorney-client privilege by the manner in which it has briefed and litigated the Motion for Summary Judgment and the Motion in Limine. Grady asserts that it is not relying on any portion of the memorandum, and certainly not the privileged portions, in defending against Brogdon's claims. [Doc. 139-1 at 13]. "To waive the attorney-client privilege . . . a defendant must do more than merely deny a plaintiff's allegations. The holder must inject a new factual or legal issue into the case." *Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1098 (7th Cir. 1987). Grady has not put at issue the substance of Jefferson's advice and is not using attorney communications as a sword to defend against Brogdon's claims. Moreover, to the extent that Grady has mentioned or discussed Jefferson's memorandum in its briefing on the pending motions, Grady did so only generally in its unsealed brief in support of the Motion for Summary Judgment and went into more detail in its sealed reply brief and in its Motion in Limine briefs only to respond to Brogdon's arguments and to explain to the Court why it challenges the admissibility of the redacted information in this litigation.

18

In sum, there has been no waiver of the attorney-client privilege.

## C.    Relevancy and Risk of Unfair Prejudice

Grady next argues that no part of the memorandum is relevant to Brogdon's claims in this case.  [Doc. 139-1 at 13].  With respect to redacted portions of the memorandum, in particular, Grady emphasizes that those legal opinions and advice relate to personnel actions that involved other employees and that occurred several years before the events forming the basis for Brogdon's claims in this case.  For these additional reasons, Grady asserts that the redactions should be excluded from evidence.

The Court need not and does not address the relevancy of the portions of the memorandum that the Court has ruled are protected by the attorney-client privilege.  Those privileged portions of the memorandum will not be considered for any purpose in this litigation.

While Grady may continue to dispute the relevancy of the information in the memorandum that I determined was not legal in nature, I deem that information to be no different than the other nonprivileged portions of the memorandum.  The Motion in Limine seeks to exclude from evidence only the legal opinions and advice that Jefferson provided Grady's executives, not the entire memorandum.  [Doc. 139-1 at 13–15; Doc. 157 at 1–2, 8].  Therefore, the Court will not undertake an analysis

of the relevance of the remainder of the memo or whether the probative value of the

remainder of the memo is substantially outweighed by the danger of unfair prejudice.

In evaluating Defendants' Motion for Summary Judgment, the Court will determine

what evidence is material and will consider that evidence accordingly.

In summary, consistent with my rulings at the hearing and as set forth above,

the Motion in Limine is granted in part.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is authorized when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(a).  The party seeking summary judgment bears

the burden of demonstrating the absence of a genuine dispute as to any material fact.

*See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Bingham, Ltd. v. United

States*, 724 F.2d 921, 924 (11th Cir. 1984).  The movant carries this burden by

showing the court that there is "an absence of evidence to support the nonmoving

party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The court must

view the evidence and all factual inferences in the light most favorable to the

nonmoving party. *Adickes*, 398 U.S. at 158–59.

Once the moving party has adequately supported its motion, the nonmoving

party must come forward with specific facts that demonstrate the existence of a

genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party must "go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed facts. *See Anderson*, 477 U.S. at 249. Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are not. *Id.* at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

## IV.    <u>FACTS</u>

Considering the foregoing summary judgment standard, I find the following facts for the purpose of resolving Defendants' motion for summary judgment. These facts are taken from the parties' briefs, as the parties agreed to forego the requirements of Local Rule 56.1 as permitted by Section (j) of this Court's Order Modifying Local Rule 56.1. [Doc. 137-1 at 1 n.1; Doc. 149 at 1 n.1]. In finding these facts, I have not scoured the expansive evidence in the record; rather, I have

relied on the parties to cite directly to the evidence that supports the respective facts that they present.  To the extent a party did not support a fact with a citation to evidence, particularly describing the evidentiary source with page numbers, or the evidence cited does not support the fact, I have not included the fact below.  I also have not included facts that are not material to the pending summary judgment motion.

### A.    Grady and Brogdon's Employment by Grady

Grady is the City of Atlanta's public hospital.  [Haupert Dep. at 11–12].  John Haupert has been Grady's President and Chief Executive Officer ("CEO") since 2012, and Timothy Jefferson has been its General Counsel since 1998.[6]  [Haupert Dep. at 11; Jefferson Dep. at 10–11].  Grady's Office of Legal Affairs ("OLA") includes all legal functions—the Office of Corporate Compliance, the Risk Management Department, and the Internal Audit Department.  [Jefferson Dep. at 13–14; Doc. 137-5, Declaration of Timothy Jefferson "Jefferson Decl." ¶ 3].

Jefferson hired Brogdon as an Associate General Counsel on June 3, 2013.  [Brogdon Dep. at 19–20, 22; Jefferson Dep. at 187].  Brogdon was promoted to a Senior Associate General Counsel position following her 2014 annual review, in

---

[6] Jefferson's current title is Executive Vice President, Chief Legal Officer, and Corporate Secretary.  [Jefferson Dep. at 10–11].

which Jefferson wrote that "Bisa has done an outstanding job representing this institution. I am therefore recommending that she be elevated to the position of Senior Associate General Counsel."[7] [Doc. 130-2, Jefferson Dep. Ex. 16 (Doc. 130-2 at 23)]. Among other responsibilities, Brogdon was Grady's "primary in-house litigation attorney and assume[d] a significant responsibility for litigation matters for Grady." [*Id.* at 22]. She was responsible for "providing legal counsel . . . throughout the organization," and she had a significant professional duty to protect Grady's attorney-client privileged information. [Brogdon Dep. at 21–22, 27–29, 317].

Brogdon had excellent annual performance reviews from Jefferson each year between 2014 and 2018. [Doc. 130-2, Jefferson Dep. Exs. 16-21 (Doc. 130-2 at 17–57)]. There was a period of time when Haupert, as Jefferson's supervisor, approved Jefferson's reviews of Brogdon or at least received them. [Haupert Dep. at 51]. Grady did not conduct written reviews in 2019 and 2020, due to a catastrophic flood in 2019 and the COVID pandemic in 2020. [Jefferson Dep. at 204–05]. However, Jefferson testified that he did not recall giving Brogdon a negative verbal review in

---

[7] Including Brogdon, Grady employed four Senior Associate General Counsels. [Jefferson Decl. ¶ 3]. The other Senior Associate General Counsels were Samantha Johnson, a White female; DeAngelo Norris, a Black male; and Lauren Bellamy, a Black female. [*Id.*].

2019,[8] and Jefferson did a verbal review with Brogdon and all of the lawyers in 2020 and said he was "satisfied with the way the office was operating." [Jefferson Dep. at 205–06].

In a September 2020 presentation (fourteen months before Brogdon's termination) Haupert identified Brogdon to the Grady Board's Compensation Committee for a "possible next step" of "General Counsel or VP of Compliance" (i.e., Jefferson's possible successor). [Doc. 129-1, Haupert Dep. Ex. E (Doc. 129-1 at 360)]. In another Board presentation, Brogdon was also identified as part of the "[r]eplacement strategy" for Jefferson (the General Counsel), both as an "interim/emergent" and "permanent" replacement. [*Id.* at 323].

### B.    Jefferson's Performance as General Counsel

Jefferson, Brogdon's boss, received an unfavorable 2018 annual review from Haupert in April 2019. [Doc. 129-1, Haupert Dep. Ex. J (Doc. 129-1 at 427–38)].

---

[8] Brogdon states in her brief that Jefferson testified that "he did not recall ever giving her a negative verbal review." [Doc. 149 at 5, 27]. This is a mischaracterization of Jefferson's testimony. Jefferson testified that he did not recall giving her a negative verbal review in 2019. [Jefferson Dep. at 205]. Likewise, Brogdon states in her brief that Jefferson testified that she did good work. [Doc. 145 at 4, 27]. Jefferson actually testified that she did good work as a lawyer in 2013, 2014, and 2015. [Jefferson Dep. at 190]. Thus, Brogdon's attempt to suggest that Jefferson made these statements without reference to specific time periods and that Jefferson changed his opinions of Brogdon soon after she spoke out about discrimination and unfair treatment is misleading and disingenuous.

In that review, Haupert wrote that Jefferson was not open to constructive feedback or making improvements, was not collaborative, and violated confidences, which was "extremely unprofessional." [*Id.* at 434–35]. Haupert also critiqued Jefferson for not reporting complaints of sexual harassment in Grady's OLA to Grady's Human Resources ("HR") Department. [*Id.* at 435]. Haupert and Frank Blake, Chairman of the Grady Board, planned to fire Jefferson in early 2019 and even drafted talking points for the conversation. [*Id.* at 366–69].

In response to the 2018 annual review, Jefferson sent a memorandum to Haupert and Blake, in which he contested Haupert's criticisms. [Doc. 126-1, Brogdon Ex. 4 (Doc. 126-1 at 462–71)]. As discussed previously, portions of this memorandum memorialize legal advice that Jefferson had previously given Grady's executives about certain proposed job actions. [Brogdon Dep. at 298–305, 311–13, 317; Haupert Dep. at 223–24; Jefferson Dep. at 138, 166–68, 170; Doc. 132-1, Deposition of Penn Payne "Payne Dep." at 172]. Jefferson testified at his deposition that he reiterated this legal advice in the memorandum because his advice had created tension with Lina George, who was Grady's Chief HR Officer at the time, and Jefferson believed that George contributed to Haupert's performance criticisms. [Jefferson Dep. at 49, 137–38, 149–51, 165–70, 180]. In his memorandum, Jefferson also described his own personal experiences with what he believed to be

racism at Grady. [Doc. 126-1, Brogdon Ex. 4 (Doc. 126-1 at 468)]. For example, Jefferson wrote that he sent Haupert an "email advising him that all of [his] white counterparts are allowed to select their own staff, but for some reason, [he] could not do the same." [*Id.*]. Jefferson shared this memorandum with his personal attorney.[9] [Jefferson Dep. at 154–56].

Haupert testified that some of his criticisms of Jefferson were not factually correct. [Haupert Dep. at 114–15, 118–19, 120, 124–25, 175–77, 182, 220–21]. Haupert also testified that George was pushing to terminate Jefferson, but Haupert ultimately decided that Jefferson was too valuable to Grady and that Jefferson could improve. [*Id.* at 115–16]. Jefferson's concerns about the 2018 annual review were resolved when Jefferson and Blake began having regular meetings in 2019. [Jefferson Dep at 177–78, 180]. In 2021, Grady's Chairman of the Board expunged Jefferson's 2018 annual review. [*Id.* at 176]. Thus, although there had been a plan

---

[9] Jefferson provided a copy of the memorandum to Brogdon to proofread before he sent the document to Haupert and Blake. [Jefferson Dep. at 245; Brogdon Dep. at 297]. Brogdon testified that she did not have Jefferson's permission to give the memorandum to anyone, but she kept a copy of the memorandum and eventually gave a copy of the document to her attorneys, who were adverse to Grady on an employment matter involving another Grady employee. [Brogdon Dep. at 283–85, 298–99]. On or about July 30, 2021, Defendants learned that Brogdon shared the memorandum with her attorneys after her then attorney mentioned the memorandum in a demand letter. [Jefferson Decl. ¶ 9].

to fire Jefferson, Grady did not do so.  Jefferson continues to serve as General Counsel of Grady.  [Jefferson Decl. ¶ 2].

## C.    Changes at Grady Under Haupert's Leadership

During Haupert's tenure, "Grady terminated the employment of a number of employees through reorganizations and restructurings of various departments or through individual terminations."  [Doc. 126-1, Brogdon Dep. Ex. 6 "the Payne Report" (Doc. 126-1 at 480)].  According to Haupert, "Grady was in the process of transitioning from the 'old Grady' to the 'new Grady.'  The old Grady was ineffective and poorly governed.  It was full of great people but also some people who were incompetent."  [*Id.*].  Haupert viewed Grady as "no longer [being] an entitlement worksite." [Doc. 132-1, Payne Dep. Ex. D (Doc. 132-1 at 316)].  During his deposition, Haupert admitted that after his arrival in 2012, he was accused of "bleaching" Grady.  [Haupert Dep. at 133–34].  Referring to himself, Haupert testified that there was concern that a "white guy" was brought in to lead Grady.  [*Id.* at 133].

## D.    Brogdon's Interest in a Promotion

Brogdon testified that she told Jefferson in September 2020 and February 2021 that she was interested in being promoted in the organization.  [Brogdon Dep. at 57–58].  Brogdon testified that she wanted Jefferson to create a deputy general

counsel position for her.  [*Id.* at 58, 68].  Brogdon requested the promotion after a White female colleague was promoted from Executive Director of Risk Management to Vice President of Risk Management, which Brogdon described as an "upgrade" of her previous position.[10]  [Payne Report (Doc. 126-2 at 6); Brogdon Dep. at 167–68].   Brogdon testified that during the September 2020 and February 2021 conversations, Jefferson told her that the organization would not promote her because she was Black, that Haupert would not support Brogdon's promotion, and that Haupert did not support the promotion of Black leaders.  [Payne Report (Doc. 126-2 at 6); Brogdon Dep. at 31–32, 57–60, 68].

It is undisputed that Grady did not have a deputy general counsel position when Brogdon was hired or at any time during her employment.  [Brogdon Dep. at 62–63, 68].  Jefferson told Brogdon that creating such a position would require the approval of Haupert and the Board of Directors, and that he (Jefferson) was not in favor of creating it.  [Jefferson Dep. at 253–56; Brogdon Dep. at 60–61, 64, 69].

At Brogdon's request, however, Jefferson spoke with Haupert about possibly creating a new deputy general counsel position.  [Jefferson Dep. at 254].  It is

---

[10] Brogdon also testified that Jefferson wanted to upgrade that position, even before the White female began working as Executive Director of Risk Management. [Brogdon Dep. at 167].

undisputed that Jefferson and Haupert decided that the position was not needed because Jefferson was not retiring any time soon.  [*Id.* at 254–56].  It is also undisputed that Jefferson never promised Brogdon a deputy general counsel position. [Brogdon Dep. at 350, 354].  Pursuant to Grady's policies, even if a deputy general counsel position had been created, the position would have to have been posted, and both internal and external applicants could have been considered. [Jefferson Dep. at 254–56; Brogdon Dep. at 62–67].  Brogdon admitted at her deposition that she does not know what the qualifications for a deputy general counsel position would have been or what experience would have been required to become a deputy general counsel.  [Brogdon Dep. at 66].  Brogdon also admitted that she was not necessarily more qualified to be a deputy general counsel than the other attorneys in the OLA.  [*Id.*].

### E.    The Sexual Harassment Investigation

In August 2018, a female paralegal in Grady's OLA accused a male attorney colleague of grabbing her breasts and kissing her neck inside her home after he had driven her home.  [Doc. 130-1, Jefferson Dep. Ex. E (Doc. 130-1 at 354)].  After the incident, the paralegal reported it to her supervisor,  Felecia Daniel, who reported to Jefferson.  [*Id.* at 356–57].  Daniel testified that she thought the paralegal was lying and that the "flamboyant" or revealing way the paralegal dressed "could have enticed

or encouraged or invited someone to—[.]"  [Doc. 127-1, Deposition of Felecia Daniel "Daniel Dep." at 37–39].  Daniel claimed that "to the extent that [the paralegal] was harassed, she was partially responsible for that because she exposed herself in a way [Daniel] found to be inappropriate."  [*Id.* at 38–39].

When Jefferson learned of the incident, he did not initially inform HR about it.  [Doc. 129-1, Haupert Dep. Ex. H (Doc. 129-1 at 435); Jefferson Dep. at 25–26]. Jefferson also instructed the paralegal not to report the incident to HR.  [Doc. 133-1, Deposition of M. Williams "Williams Dep." at 42].  The paralegal never intended to file a sexual harassment suit against Jefferson or Grady.  [*Id.* at 37–38].  However, Jefferson was concerned that the paralegal "had an agenda."  [Jefferson Dep. at 37]. Jefferson retained Randy Gepp, a partner at the law firm Taylor English Duma, to investigate the allegations of sexual assault and harassment; he did this before notifying Grady's HR department.  [*Id.* at 25–26].

The paralegal and the colleague she accused of sexual assault and harassment were instructed not to work together.  [Williams Dep. at 73–74, 105–06].  In addition, Jefferson reprimanded the male colleague for engaging in poor judgment. [Jefferson Dep. at 24–25, 32–34, 43–44].  Brogdon testified that she was annoyed and inconvenienced by the new working arrangement because it required her to reassign some work assignments and left her with fewer paralegals to do her work.

[Brogdon Dep. at 106, 146, 148, 223].  Moreover, Brogdon testified that this made her work environment "hostile" because both the paralegal and the male colleague came to Brogdon to discuss the situation.  [*Id.* at 146–49].  Brogdon testified that both the complaint itself and Grady's investigation of that complaint made Brogdon's workplace hostile generally; she admitted, however, that no one was hostile toward her.  [*Id.* at 146–50].

Two or three months after the completion of the investigation, the paralegal complained to Jefferson that the investigation of her complaint was unfair and biased.  [Jefferson Dep. at 41, 250–51; Brogdon Dep. at 111–13, 115, 118, 124–25].  Jefferson responded that the investigation was complete and would not be revisited, but that she could take her concerns to Grady's HR Department or to Haupert.  [Jefferson Dep. at 41, 250].

In the fall of 2018, after the investigation had concluded, the paralegal confided in Brogdon that she felt the investigation was unfair and biased against her.  [Brogdon Dep. at 111–14].  Brogdon testified that when Jefferson learned of the conversation that the female paralegal had with her, he directed Brogdon (in Daniel's presence) to help him "nip this in the bud," which Brogdon interpreted to mean to prevent any examination of the paralegal's complaint of unfairness.  [*Id.* at 114].  Brogdon testified that she considered this comment "hostile to [her]."  [*Id*. at 145–

31

46].  Daniel corroborated that Jefferson instructed that he wanted the issue resolved immediately.  [Daniel Dep. at 41–43].

### F.    Jefferson's Sex Discrimination and Sexual Harassment

Brogdon claims that Jefferson engaged in pervasive sex discrimination against other people.  First, Brogdon claims that Jefferson acted in a discriminatory fashion by not disciplining the male colleague accused in the aforementioned incident with the paralegal.  Brogdon testified, however, that she does not know if the male colleague was or was not disciplined.  [Brogdon Dep. at 223–24].  Second, Brogdon challenges the promotion of a male paralegal over a female paralegal, claiming that one time the male paralegal refused to do work that Brogdon, "as a woman," asked him to do.  [*Id.* at 119–21, 223–24].  Brogdon testified, however, that the male paralegal had been employed by Grady much longer than the female paralegal and was more experienced.  [*Id.* at 119–21].  Moreover, Jefferson testified that he counseled the male paralegal after Brogdon's complaint about his refusal to do the work that Brogdon requested of him.  [Jefferson Dep. at 228–30].  Third, Brogdon testified that Jefferson gave the male paralegal assignments but did not give the female paralegal assignments.  [Brogdon Dep. at 119–20, 122–23, 223].  Brogdon testified that she spoke to Jefferson about his not using the female paralegal, and she told him that it could appear to be retaliatory.  [*Id.* at 122–23].  Brogdon, however,

never discussed with Jefferson the skills that the male paralegal had that Jefferson liked or other reasons Jefferson enjoyed working with the male paralegal. [*Id.* at 125–26]. Fourth, Brogdon claims that prior to 2018, Jefferson called a female opposing counsel a "slut" in Brogdon's presence. [*Id.* at 133–35, 223]. This was the only time that Brogdon recalled Jefferson using a sexually stereotypical term. [*Id.* at 134]. Fifth, Brogdon claims that Jefferson has a history of engaging in sexually harassing conduct. Daniel testified that a female legal assistant had an interaction with Jefferson where they bumped into one another, and the legal assistant felt uncomfortable. [Daniel Dep. at 21–26]. Brogdon testified that two other employees told her that multiple women had previously accused Jefferson of harassment. [Brogdon Dep. at 270–71].

Brogdon identified a single incident of improper behavior toward her. She testified that on June 30, 2021, during a meeting to discuss Brogdon's workplace demeanor, Jefferson informed Brogdon that she seemed "unhappy" and made others in the office unhappy, too. [Doc. 126-1, Brogdon Dep. Ex. 2 (Doc. 126-1 at 457)]. Brogdon testified that Jefferson told her that she needed to look happy, and she testified that she "cannot imagine" Jefferson saying that to a male attorney.

[Brogdon Dep. at 222–23].  Moreover, Brogdon understood Jefferson to indicate that if she did not change her attitude, he would fire her.  [*Id.* at 195–98].

### G.    Brogdon's Issues with a Grady Colleague and Outside Counsel

On June 4, 2021, Jefferson met with outside counsel regarding a matter that Brogdon was managing.  Brogdon was not available to meet at the time, but Jefferson decided to meet with outside counsel anyway.  [Jefferson Dep. at 212–13; Doc. 131-1, Deposition of Angela King "King Dep." at 31–32].  The following day, Brogdon sent a series of emails to outside counsel inquiring about the meeting and demanding to know who set up the meeting.  [Doc. 126-4, Brogdon Dep. Ex. 18 (Doc. 126-4 at 51–54)].  Brogdon then sent an email accusing a Grady colleague of setting up the meeting between Jefferson and outside counsel, which the colleague denied.  [King Dep. at 33–35; Brogdon Dep. at 174–75; Doc. 126-4, Brogdon Dep. Ex. 17 (Doc. 126-4 at 48–50)].  Jefferson, who was copied on the emails between Brogdon and the Grady colleague, then informed Brogdon that he set up the meeting with outside counsel.  [Jefferson Dep. at 213–14; Doc. 126-4, Brogdon Dep. Ex. 17 (Doc. 126-4 at 48–50)].  Later, the Grady colleague sent Jefferson the emails that

Brogdon had sent to outside counsel, and Jefferson considered those emails to be "unseemly." [Jefferson Dep. at 213–14].

Later that month, on June 30, 2021, Jefferson met with Brogdon. [Brogdon Dep. at 176–77, 181–83, 187–99; Jefferson Dep. at 213–17]. Brogdon recorded the meeting. [Doc. 126-1, Brogdon Dep. Ex. 2 (Doc. 126-1 at 455–60)]. During this meeting, Jefferson discussed Brogdon's email exchanges and told Brogdon that her behavior and demeanor were causing a negative workplace environment. [Brogdon Dep. at 176–77, 181–83, 187–95; Doc. 126-1, Brogdon Dep. Ex. 2 (Doc. 126-1 at 455–60)]. Jefferson advised Brogdon that the negative behaviors could not continue, and he indicated that if she was not happy, then they could talk about what would make her happy. [Jefferson Dep. at 215–17, 247–48; Doc. 126-1, Brogdon Dep. Ex. 2 (Doc. 126-1 at 457–58); Payne Dep. at 52–60, 62]. Jefferson also told Brogdon that if her conduct was not going to change, then they could "work something out." [Doc. 126-1, Brogdon Dep. Ex. 2 (Doc. 126-1 at 458)].

## H.    Brogdon's Internal Complaint and Grady's Internal Investigation

Six days later, on July 6, 2021, Brogdon filed an internal complaint with Grady's Chief HR Officer, Rick Roche, and requested an investigation. [Brogdon Dep. at 161–62, 200, 218, 335; Doc. 126-1, Brogdon Dep. Ex. 5 (Doc. 126-1 at 472–76)]. Upon receiving the internal complaint, Jefferson instructed Roche to speak

with Grady's outside counsel, Randy Gepp, who hired Penn Payne, an independent lawyer, to conduct an internal investigation and produce a report. [Jefferson Dep. at 248–49, 259–60; Payne Dep. at 30]. Payne specializes in employment law as a litigator, investigator, arbitrator, and mediator and has represented plaintiffs and defendants in race and sex discrimination and retaliation cases. [Payne Dep. at 12–14, 66–67; Doc. 132-1, Payne Dep. Ex. J (Doc. 132-1 at 425–27)]. Prior to this engagement, Payne had never performed any services for or been retained by Grady. [Payne Dep. at 32–33, 37, 167–68]. It is undisputed that Payne "was an independent investigator hired to investigate [Brogdon's] claim."[11] [Brogdon Dep. at 87].

Payne conducted interviews of Brogdon, Jefferson, Haupert, Daniel, and seven other Grady employees. [Payne Dep. at 65, 76, 107, 127, 151, 170–71, 186, 196]. The investigation concluded on October 22, 2021, with a 36-page report. [Docs. 126-1 and 126-2, Brogdon Dep. Ex. 6 "the Payne Report" (Doc. 126-1 at 480–42; Doc. 126-2 at 1–33)].

---

[11] Brogdon asserts that Payne's investigation was "adversarial" because Grady hired her and because she did not know Payne. [Brogdon Dep. at 162–63, 215–16, 220]. There is no evidence that Payne's investigation was anything but impartial, and Payne testified that no one interfered with her investigation or told her what conclusions to draw. [Payne Dep. at 170–71].

The report noted concerns among Grady's leadership about the corporate reorganization and restructuring.  For example, D'Andrea Morning, Grady's Vice President of Corporate Compliance, informed Payne during the investigation that "[t]here were issues of race, age and sometimes gender" in Grady's corporate reorganization.  [Payne Report (Doc. 126-1 at 482)].  Morning said Grady's in-house attorneys "wondered if there was something to the reorgs that was discriminatory . . . ." [*Id.*].  In-house counsel Samantha Johnson also told Payne that the job restructures at Grady "were hard to defend because they 'didn't look right' and implicated seniority, age, race and gender."  [Payne Report (Doc. 126-2 at 1)].

With respect to Brogdon's personal complaints of unfair treatment, however, Payne detailed Brogdon's allegations and determined that they lacked supporting facts and/or did not meet applicable legal standards.  [Payne Dep. at 54–57, 60, 70–72, 77, 79–80, 90–92, 109–110, 116, 121–23, 146, 172, 176, 180].  Payne found that Brogdon was not credible in some of her assertions and/or that Brogdon did not know what she was talking about.  [Doc. 132-1, Payne Dep. Ex. A (Doc. 132-1 at 260–66, 275–76, 278, 283, 285); Payne Dep. at 54–57, 60, 70–72, 79–80, 90–92, 172, 174–76)].   Payne also found that Brogdon's belief that Jefferson's memorandum was not privileged was incorrect, writing: "It's hard to believe that an attorney as experienced and intelligent as [Brogdon] would not think the

[memorandum] was privileged or at the least have concerns about using it outside its intended purpose" and that Brogdon's contrary assertion "appears . . . to be disingenuous." [Doc. 132-1, Payne Dep. Ex. A (Doc. 132-1 at 263); Payne Dep. at 172].

## I.     Brogdon's EEOC Complaint

On October 15, 2021, while Payne's investigation was ongoing, Brogdon filed a Charge of Discrimination with the EEOC alleging race discrimination, sex discrimination, retaliation, and a hostile work environment. [Doc. 126-3, Brogdon Dep. Ex. 7 (Doc. 126-3 at 4–8)]. Brogdon asserts in her brief that she "was the only Grady employee to file an EEOC complaint against Jefferson."[12] [Doc. 149 at 18 (*citing* Haupert Dep. at 37–38)]. Brogdon filed an Amended Charge of Discrimination on November 11, 2021. [Doc. 126-3, Brogdon Dep. Ex. 8 (Doc. 126-3 at 9–13)].

## J.     Brogdon's Termination

In a memorandum to Haupert and Roche dated November 3, 2021, Jefferson recommended that Brogdon be terminated for five reasons. [Doc. 130-2, Jefferson

---

[12] Brogdon named Grady Health System as her employer in her EEOC Charge, but the allegations in the EEOC Charge primarily focused on the alleged conduct of Jefferson.

Dep. Ex. 25 (Doc. 130-2 at 115–17); Jefferson Dep. at 261–62]. The first identified reason was Brogdon's unauthorized disclosure of Jefferson's memorandum to her attorneys who were adverse to Grady. [Doc. 130-2, Jefferson Dep. Ex. 25 (Doc. 130-2 at 115)]. The second reason was Defendants' loss of trust and loyalty in Brogdon due to her misuse of the memorandum. [*Id.* at 116]. In connection with this second reason, Jefferson also found concerning the factually unsupported allegations that Brogdon had raised, stating that such unfounded allegations, coming from a lawyer, were troubling. [*Id.*]. Third, Jefferson stated that Brogdon displayed poor judgment and unethical behavior by hiring Buckley Beal, a law firm that was pursuing an employment discrimination matter against Grady on behalf of another employee and for which Brogdon was the responsible Grady attorney.[13] [*Id.*]. Jefferson also mentioned in the memo that Brogdon did not immediately disclose the potential conflict of interest. [*Id.*]. The fourth reason was Brogdon's conflicts with her coworkers, her negative attitude in the office, and her correspondence with

---

[13] In an effort to rebut this reason, Brogdon testified that she was not defending Grady in the case involving the other Grady employee and that Grady was represented by outside counsel (i.e., Randy Gepp and his law firm). [Brogdon Dep. at 291–92]. Brogdon acknowledged, however, that she was the "assigned attorney" for the matter, but she testified that was a formality on some cases when outside counsel had been brought in. [*Id.* at 291]. Brogdon also testified that the matter was not in litigation at the time. [*Id.* at 292].

outside counsel.[14]  [*Id.*].  The final reason that Jefferson noted in his memo was that a Grady employee had accused Brogdon of telling her that Brogdon "does not trust any white people," and Jefferson surmised that racial animus was a possible motivation for Brogdon's inability to work with Angela King (the Vice President of Risk Management) and another White employee.  [*Id.* at 116–17].  Haupert testified that he was consulted about Brogdon's termination, but the decision to terminate was Jefferson's—not Haupert's.  [Haupert Dep. at 157].  Jefferson terminated Brogdon's employment on November 15, 2021.  [Jefferson Decl. ¶ 11].

It is undisputed that during Jefferson's employment at Grady, no other OLA employee has ever (1) disclosed privileged and confidential information to third parties without Grady's consent; (2) displayed disloyalty and engaged in behavior that caused distrust; (3) hired a law firm to pursue personal grievances while also defending Grady against litigation brought by that same firm; (4) had difficulty

---

[14] With respect to the contention that Brogdon had difficulty getting along with outside counsel, Brogdon mentions that Jefferson was asked during his deposition if he could identify the issues that outside counsel had with her. [Jefferson Dep. at 233].  Jefferson testified that he could not "recall the specifics" and that he "didn't write it down."  [*Id.* at 233–34].  Jefferson did testify, however, that the issues related to the way Brogdon was managing litigation and what she was requiring of outside counsel.  [*Id.*]

getting along with coworkers and outside counsel and created a negative work environment; and (5) exhibited racial animus. [Jefferson Decl. ¶ 11].

## V.    <u>DISCUSSION</u>

### A. Race Discrimination

In Counts One and Four of the First Amended Complaint, Brogdon brings race discrimination claims under Title VII and 42 U.S.C. § 1981. [Am. Compl. ¶¶ 103–13, 133–142]. She alleges that Defendants (1) failed to promote her, (2) created barriers to advancement based on race, (3) made false accusations against her and imposed unwarranted discipline, (4) performed a sham investigation in response to her grievance asserting race discrimination, (5) prepared and disseminated false allegations to damage her reputation, and (6) unlawfully terminated her employment. [*Id.* ¶¶ 107, 137].

At her deposition, Brogdon clarified her race discrimination claim. Brogdon testified that her race discrimination claim related only to Grady not creating a deputy general counsel position for her and to Jefferson allegedly telling her that she would not be promoted into a position because she is Black. [Brogdon Dep. at 68, 71]. When defense counsel asked Brogdon about any other incidents of race discrimination, Brogdon did not mention any false accusations made against her and the imposition of unwarranted discipline, the conducting of a sham investigation in

response to her grievance asserting race discrimination, the preparation and dissemination of false allegations to damage her reputation, or the unlawful termination of her employment. [*Id.*]. Brogdon's counsel had the opportunity to question Brogdon and clarify the record with respect to which claims she was asserting. Brogdon does not cite to any deposition testimony showing that she ever clarified her claims or saved any other claims.

With respect to the termination of her employment, Brogdon stated clearly on the record that she was not claiming that she was terminated because of her race. [Brogdon Dep. at 140]. Rather, she made clear that her termination claim was based on the fact that she had "ma[de] a claim." [*Id.* at 140–41, 164].

Based on Brogdon's deposition testimony, Defendants argue that Brogdon "vastly narrowed the scope of her claims during her deposition." [Doc. 137-1 at 2 n.2, 21 n.20]. Defendants' brief makes clear that they understood Brogdon's race discrimination claim now to be limited to failure to promote. [*Id.* at 9 n.10, 10, 21]. In response to the motion for summary judgment, Brogdon contends, in general terms only, that she did not narrow the scope of her claims and that she stands by the allegations in her First Amended Complaint. [Doc. 149 at 3 n.3].

Having closely reviewed Brogdon's testimony, I find that Brogdon limited her race discrimination claim to a failure to promote based on (1) Grady not creating

a deputy general counsel position for her; and (2) Jefferson telling her that she would not be promoted into a position because she is Black. Brogdon has abandoned any other alleged basis for asserting race discrimination.[15] *See Dix v. Air Freight Express, Inc.*, No. 1:07-CV-2494-CAM-AJB, 2009 WL 10701903, at *14 (N.D. Ga. June 9, 2009) ("This testimony disclaiming any belief that his termination was based on race or was otherwise discriminatory demonstrates that Plaintiff abandoned the discriminatory discharge claim (to the extent that he intended to raise one)."), *adopted by* 2009 WL 10701913 (N.D. Ga. July 2, 2009); *see also Parsons v. Pettway*, No. 2:20-cv-806-AMM, 2022 WL 16509539, at *6 (N.D. Ala. Sept. 21, 2022) ("Courts in this circuit have held that a plaintiff's unambiguous sworn testimony may abandon claims he pleaded."). Therefore, my discussion and analysis of Brogdon's race discrimination claim will be limited to Grady's alleged failure to

---

[15] Even if Brogdon did not abandon the claim that her employment was unlawfully terminated based on her race, Brogdon expressly testified that she did not believe that she was terminated because she is Black. [Brogdon Dep. at 140]. In this regard, Defendants' attorney asked Brogdon, "So you weren't terminated because you were Black, correct?" [*Id.*]. Brogdon responded, "No, I think I was terminated—I was terminated for making a claim." [*Id.*]. Thus, Brogdon's own deposition testimony defeats any discriminatory discharge claim, making summary judgment appropriate.

promote her and the related allegation that Grady created barriers to her advancement based on her race.

Defendants assert that summary judgment is warranted with respect to the failure to promote claim because that claim is not based on a concrete decision, but rather, on a hypothetical that has no factual or legal basis. [Doc. 137-1 at 18]. In this regard, Defendants argue that the deputy general counsel position did not exist, and that Grady's reason for not creating it—that such a position was not needed—is unrebutted. [*Id.*]. Defendants maintain that the claim is not actionable because there was no promotion decision, and they assert that Brogdon may not have been qualified for the position even if it had been created. [*Id.* at 19].

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of

contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). "It is well-settled law that § 1981 prohibits race discrimination in both the public and private employment context." *White v. Crystal Mover Servs., Inc.*, No. 1:14-cv-3202-ELR-JSA, 2016 WL 8787057, at *13 (N.D. Ga. Jan. 26, 2016), *adopted by* 2016 WL 9065878 (N.D. Ga. Mar. 14, 2016), *aff'd*, 675 F. App'x 913 (11th Cir. 2017). Courts apply the same analytical framework when addressing claims of discrimination under Title VII and Section 1981. *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).

Under Title VII and/or Section 1981, the plaintiff "bears the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." *Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008) (internal quotation marks omitted). To do so, the plaintiff must present either "direct evidence of an intent to discriminate or circumstantial evidence" generally using the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *Crawford*, 529 F.3d at 975.

Here, Brogdon relies on what she claims is direct evidence of a discriminatory failure to promote. [Doc. 149 at 28–29]. "Direct evidence is that which shows an employer's discriminatory intent 'without any inference or presumption.'" *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000) (citation

omitted). "By contrast, any evidence that requires an inferential step is circumstantial." *Reeves v. Columbus Consol. Gov't*, No. 23-11463, 2024 WL 33903, at *1 (11th Cir. Jan. 3, 2024). Brogdon asserts that when she requested that a deputy general counsel position be created for her, Jefferson told her on two occasions that Haupert would not support her promotion because she is Black and that Haupert did not support the promotion of Black leaders. [Brogdon Dep. at 57–58, 60–61]. This evidence, however troubling, is not direct evidence of discrimination. Jefferson's statements are nothing more than hypothetical or speculative statements that Haupert would not promote Brogdon because she is Black.[16] A plaintiff cannot survive summary judgment under the direct evidence approach when "her evidence requires inference or, to be more accurate, speculation to reach a finding of intentional race-based discrimination." *Reeves*, 2024 WL 33903, at *2. Jefferson's statements regarding Haupert's discriminatory animus are not direct evidence that Haupert did not promote Brogdon or create a deputy general counsel position for her because she is Black.[17]

---

[16] Brogdon admitted during her deposition that Jefferson did not have the authority to create the deputy general counsel position himself and that creating the position would have required Haupert's approval. [Brogdon Dep. at 64].

[17] To the extent Brogdon claims that Jefferson's remarks are direct evidence that Grady generally created barriers to her advancement based on her race, this contention also is without merit. Remarks that are not tied to a challenged

Brogdon also cannot survive summary judgment under the *McDonnell Douglas* framework because she cannot establish a prima facie case. Initially, Brogdon must establish that (1) she belongs to a protected class, (2) she applied for and was qualified for a promotion, (3) she was rejected despite her qualifications, and (4) others outside her class were promoted. *Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010). Here, there was no deputy general counsel position available, and there is no actionable failure to promote claim in the absence of an adverse decision regarding an actual position.[18] *Rutstein v. Avis Rent–A–Car Sys., Inc.*, 211 F.3d 1228, 1238 n.19 (11th Cir. 2000) ("If there never was a job, it would be inappropriate to allow suits against the employer for wrongful rejection. Every member of every protected class would have a right to a job of his or her

---

employment decision are not direct evidence of discrimination. *Robertson v. Riverstone Cmtys., LLC*, 849 F. App'x 795, 801 (11th Cir. 2021) (per curiam).

[18] Brogdon argues that positions were created for other employees, noting that a special position was created for Angela King, a White female. [Doc. 149 at 2]. However, Brogdon's testimony was that King's position was an "upgrade" of her prior position, not that a new position was created. [Brogdon Dep. at 167–68]. To the extent this personnel action could be fairly characterized as the creation of a new position, Brogdon points to no evidence regarding whether King requested the creation of that position, who authorized the creation of that position, and who made the decision to promote King to that position. Brogdon has failed to show that her situation was similar to King's. Brogdon's suggestion that Grady discriminated against her by creating a position for King but not creating a position for her does not create a genuine issue precluding summary judgment.

choice, regardless of whether or not there is a job to be had."); *Austin v. Progressive RSC, Inc.*, 265 F. App'x 836, 842 (11th Cir. 2008) (per curiam) ("First, a CSOA III position did not exist at the Riverview facility, and the absence of an available position was fatal to Austin's claim."); *Jones v. Firestone Tire and Rubber Co., Inc.*, 977 F.2d 527, 533–34 (11th Cir. 1992) ("Jones did not have a Title VII claim with regard to market-level jobs because no market-level jobs were available in the Metro–Market Zone."). Moreover, Brogdon admitted during her deposition that she did not know what the qualifications and requisite experience for a deputy general counsel position might have been. [Brogdon Dep. at 66]. Brogdon also admitted that she was not necessarily more qualified to be a deputy general counsel than the other attorneys in the OLA.[19] [*Id.*]. Finally, Grady never created a deputy general counsel position,[20] so no one was ever selected for such a position.

As noted above, Brogdon points to other evidence of discrimination at Grady that does not directly involve her. [Doc. 149 at 6–7, 9–10, 28–29]. This evidence does not rehabilitate Brogdon's failure to point to evidence of intentional race

---

[19] As mentioned earlier in this Order, Grady employed four Senior Associate General Counsels, including Brogdon. [Jefferson Decl. ¶ 3].

[20] Brogdon has not disputed Defendants' evidence that a deputy general counsel position was not needed. [Jefferson Dep. at 254–56].

discrimination adversely affecting her.  For example, Brogdon mentions Haupert's comments about "transitioning from the 'old Grady' to the 'new Grady'" and Grady no longer being an "entitlement worksite."  [*Id.* at 6–7].  She also references Haupert's acknowledgement during his deposition that people were concerned about a "white guy" leading Grady.  [*Id.* at 7].  Brogdon points to other evidence that she contends establishes a broader pattern of race discrimination at Grady.  [*Id.* at 9–10, 28–29].  Finally, Brogdon claims that while "the Payne Report concluded that there was no discrimination at Grady . . . the underlying data upon which the report relies indicates otherwise."  [*Id.* at 16].  In their reply brief, Defendants thoroughly explain why all of this extraneous evidence cannot be used to defeat summary judgment, and those arguments are well taken.  [Doc. 156 at 19–23].  Most importantly, however, none of Brogdon's evidence shows that Defendants intentionally discriminated against her based on her race.

In sum, Brogdon has not presented direct evidence of race discrimination, and she has not presented any evidence of conduct that otherwise demonstrates intentional discrimination against her.  For the above reasons, I will grant summary

judgment on Brogdon's race discrimination claims set forth in Counts One and Four of the First Amended Complaint.

## B. Sex Discrimination

In Count Two of her First Amended Complaint, Brogdon brings a sex discrimination claim under Title VII against Grady. [Am. Compl. ¶¶ 114–22]. In the First Amended Complaint, she alleges that Grady is liable for (1) subjecting her to a sexually discriminatory and hostile work environment, (2) subjecting her to discriminatory and sex stereotyping and sex-based comments, (3) holding her to different behavioral standards than her male counterparts, (4) conducting a sham investigation in response to her grievance and opposition activity, (5) preparing and disseminating false allegations to damage her reputation, and (6) terminating her employment. [*Id.* ¶ 116].

At her deposition, however, Brogdon identified only a disparate treatment claim related to the handling and investigation of workplace complaints and a hostile work environment claim. [Brogdon Dep. at 86–87, 132]. When asked about any other sex discrimination claims, Brogdon did not mention or describe any other disparate treatment claim based on sex that involved her, and she specifically testified that she was not asserting a sexual harassment claim or a claim that she was terminated because of her sex. [*Id.* at 86, 140]. Brogdon testified that she had no

additional information to share regarding other incidents of sex discrimination against her. [*Id.* at 145]. Given this testimony, I conclude that Brogdon's only sex discrimination claims are her disparate treatment claim related to workplace complaints and investigations and her hostile work environment claim. Brogdon has abandoned all other sex discrimination claims asserted in the First Amended Complaint. *See Dix*, 2009 WL 10701903, at *13–14; *Parsons*, 2022 WL 16509539, at *6.

Grady moves for summary judgment on Brogdon's sex discrimination and hostile work environment claims. Grady argues that any claim for disparate treatment is without merit because there is no evidence that Brogdon suffered any adverse action based on her sex. [Doc. 137-1 at 19]. Grady argues that it is entitled to summary judgment on the hostile work environment claim because (1) Brogdon fails to point to evidence that some of the conduct she complains of was based on her sex, (2) Brogdon fails to show that the conduct was severe or pervasive, and (3) the claim is untimely. [*Id.* at 18]. I agree with each of Grady's arguments.

### 1. Disparate Treatment

Grady argues that any sex-based disparate treatment claim is without merit because there is no evidence that Brogdon suffered any adverse action based on her sex. To establish a prima facie case of disparate treatment, which is one method of

showing intentional discrimination, a plaintiff must show: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc) (citations omitted).

In the instant case, Brogdon testified that female employees who made workplace complaints were not treated as favorably as male employees who made workplace complaints. [Brogdon Dep. at 86–87, 132]. Brogdon specifically raised as an issue that the 2018 investigation of the male colleague who was accused of sexual harassment was handled more favorably than her complaint to HR in 2021. [*Id.* at 87–91]. The problem with this argument is that both complaints were made by women. Thus, to the extent that the complaints were handled or investigated differently, the sex of the complainant had nothing to do with that.

In her brief opposing Defendants' motion for summary judgment, Brogdon appears to argue that she was treated differently than Jefferson (a male) because she was fired for sharing Jefferson's memorandum with her counsel, but he was not disciplined after he violated company policy requiring him to inform HR of sexual harassment complaints. [Doc. 149 at 2, 12–14, 19]. Additionally, during the hearing that the Court held on the Motion in Limine, Brogdon's counsel argued that Jefferson

was treated more favorably than Brogdon because he was not terminated after he shared his memorandum with his personal attorney. Brogdon did not identify these disparate treatment theories when counsel asked her about her sex discrimination claims during her deposition. [Brogdon Dep. at 86–87, 132, 145]. Nevertheless, even if the Court were to consider these claims, Brogdon testified unequivocally that she was not claiming that she was terminated based on her sex, and Brogdon has not pointed to evidence of any other disciplinary action that she suffered. [Brogdon Dep. at 140]. Therefore, any claim by Brogdon that she was disciplined more harshly than Jefferson because of her sex is defeated by her own testimony.

Grady is entitled to summary judgment on Brogdon's disparate treatment claim in Count Two of the First Amended Complaint.

### 2. Hostile Work Environment

A hostile work environment is one form of disparate treatment on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). While other disparate treatment claims scrutinize discrete actions, such as a demotion or termination, a hostile work environment claim analyzes a workplace environment as a whole to determine if it is abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). A work environment is abusive when misconduct has reached a certain qualitative level that is "sufficiently severe or pervasive [so as] to alter the conditions

of [the victim's] employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67

(1986) (second alteration in original) (internal quotation marks and citation omitted).

The Eleventh Circuit's summary of the governing standard is helpful: "To establish

that a workplace constitutes a 'hostile work environment,' a plaintiff must show that

'the workplace is permeated with discriminatory intimidation, ridicule, and insult,

that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" *Rojas v. Florida*, 285

F.3d 1339, 1344 (11th Cir. 2002) (quoting *Harris*, 510 U.S. at 21).

The conduct that Brogdon claims contributed to a hostile work environment

based on sex[21] includes the following:

- Jefferson's comments regarding Brogdon's unhappiness during a meeting on June 30, 2021;

- various inconveniences and events that occurred after the female paralegal complained about sexual harassment in 2018; and

- Jefferson's reference to a female lawyer as a "slut" at some time prior to 2018.

As the Court will explain, these acts, considered separately or together, were not severe or pervasive. Furthermore, Brogdon has failed to show that Jefferson's comments regarding her unhappiness were based on her sex. Finally, the remaining conduct occurred years before Brogdon filed her EEOC Charge.

> ### a. *The Conduct Was Not Severe and Pervasive.*

Defendants argue that Brogdon cannot show that the conduct she complains of was severe or pervasive. [Doc. 137-1 at 20]. In response to Defendants' motion,

---

[21] Brogdon testified that a female colleague began to interfere with her abilities to do her work after Brogdon made the request to Jefferson for a promotion. [Brogdon Dep. at 145, 227–31]. Brogdon does not explain the connection between the promotion request and the purported job interference. In any event, Brogdon admitted in her deposition that she did not believe the female colleague's actions were based on her (Brogdon's) sex. [*Id.* at 231]. Therefore, the Court does not consider this work interference to be a part of Brogdon's hostile work environment claim based on sex.

Brogdon failed to challenge or address this argument. *See generally* [Doc. 149]. It is well-settled that a plaintiff's failure to respond to a defendant's argument in a motion for summary judgment results in that argument being deemed unopposed or conceded. *Bonte v. U.S. Bank N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver" and "silence leaves us to conclude" a concession); *Dieudonne v. Yardley Car Co.*, No. 19-60070-CIV-COHN/SELTZER, 2019 WL 12288179, at *7–8 (S.D. Fla. Aug. 22, 2019) (deeming hostile work environment claim abandoned where the plaintiff offered no response to the argument that the conduct he complained of was insufficiently severe or pervasive to establish a claim for hostile work environment); *White v. Ga. Dep't of Motor Vehicle Safety*, No. 1:06-cv-124-TWT, 2006 WL 1466254, at *1 (N.D. Ga. May 19, 2006) ("[I]t is well-accepted in this district that the failure to respond to arguments relating to a claim constitutes abandonment of the claim."). Thus, I conclude that Brogdon has abandoned the hostile work environment claim, making summary judgment appropriate.

### b. *Jefferson's Comments Regarding Unhappiness Were Not Sex-Based.*

Even if Brogdon had not abandoned the hostile work environment claim, the claim fails for other reasons, including that Brogdon has not shown that all of the harassing acts were based on her sex. Brogdon testified that Jefferson told her during

their meeting on June 30, 2021, that she "must seem 'happy' as a female attorney in order to keep [her] job." [Brogdon Dep. at 223]. Brogdon recorded this meeting. The transcript does not support Brogdon's recitation of the facts. Rather, the transcript reflects that Jefferson told Brogdon that he could tell she was not happy, and he told her that they could talk about what would make her happy. [Doc. 126-1, Brogdon Dep. Ex. 2 (Doc. 126-1 at 457–58)]. Jefferson also stated, "[W]e're not going to have a situation where you continue to be unhappy here and it reflects in the entire office." [*Id.* at 457]. He told her that the unhappiness she was exhibiting did not work for him, and he emphasized that they needed to work something out if she was not happy. [*Id.* at 458–59]. Jefferson wrapped up the meeting by telling Brogdon:

> And so, you know, whatever it is that has you unhappy, we need to figure out what it is and fix it or do something else, okay. But we're not going to continue this way. I mean, you need to think about it, and we can work on whatever it is that's troubling you. But I'm not going to continue this, okay. So you need to come and tell me what you want to do, whether things will change with you or whether you feel like you need to continue down the road that you're on. But, you know, you tell me. And, you know, and if it continues, then I will tell you.

[*Id.* at 459]. Jefferson never mentioned anything about Brogdon being a "female attorney," and he did not otherwise reference her sex during the meeting.

Brogdon nevertheless argues that Jefferson's comment about her unhappiness carried implications of gender bias. [Doc. 149 at 19]. When evaluating hostile work

environment claims, courts should only consider purported harassment or conduct based on the protected characteristic. *See Enwonwu v. Fulton-Dekalb Hosp. Auth.*, 286 F. App'x 586, 602 (11th Cir. 2008) (per curiam); *see also Cross v. State of Ala. Dep't of Mental Health*, 49 F.3d 1490, 1504 (11th Cir. 1995) (stating that the harassment or conduct complained of must be based upon a protected characteristic). Courts presented with evidence of comments like those made by Jefferson have rejected the argument that such comments are based on sex or gender. *See Reynolds v. Sovran Acquisitions, L.P.*, No. 3:14-CV-1879-D, 2015 WL 6501552, at *8 (N.D. Tex. Oct. 27, 2015) ("Bagwell's comments that Reynolds should be more 'friendly and bubbly' toward people and that she was not happy in her job and should consider quitting neither implicate age nor sex nor demonstrate discriminatory animus on either basis."), *aff'd*, 650 F. App'x 178 (5th Cir. 2016); *Robertson v. Dodaro*, 767 F. Supp. 2d 185, 193–94 (D.D.C. 2011) (holding that male supervisors' gender-neutral criticisms of the female plaintiff as "unhappy," "dismissive," "superior," "condescending," and "sarcastic" could not be considered statements of discriminatory animus when the only evidence proffered by the plaintiff that the statements were gender-based was her own opinion, the gender difference of the parties, and a prior comment that she should "watch her tone"). I find these cases to be persuasive. Brogdon's speculation that Jefferson's comments about her

unhappiness had gender connotations is not sufficient to support the claim that Brogdon was subjected to a hostile work environment based on her sex.

> c. *The Hostile Work Environment Claim is Time-Barred Because the Remaining Conduct Occurred Years Before Brogdon's EEOC Charge.*

Before filing a lawsuit in federal court under Title VII, a plaintiff must first exhaust her administrative remedies by filing a charge of discrimination with the EEOC. *Reed v. Winn Dixie, Inc.*, 677 F. App'x 607, 609–10 (11th Cir. 2017) (per curiam). "For a charge to be timely in a non-deferral state such as Georgia, it must be filed within 180 days of the last discriminatory act." *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (citations omitted). Any claim based on a discrete act of discrimination prior to the 180-day period is not actionable. *See, e.g.*, *Turlington v. Atlanta Gas Light*, 135 F.3d 1428, 1435 (11th Cir. 1998); *Beavers v. Am. Cast Iron Pipe Co.*, 975 F.2d 792, 796 (11th Cir. 1992). However, a hostile work environment claim can be timely even if the first instance of contributing conduct "occurred" more than 180 days before the charge was filed. The Supreme Court has recognized that a hostile work environment claim based upon racial or sexual harassment "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e–5(e)(1)).

For that reason, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [180-day] time period." *Id.* at 122. An act that is not based on a protected characteristic is due to be disregarded for purposes of determining the timeliness of the hostile work environment claim. *See Menefee v. Montgomery Cnty. Bd. of Educ.*, 137 F. App'x 232, 233–34 (11th Cir. 2005) (per curiam) (holding that plaintiff's hostile work environment claim was time-barred because the conduct that would have made plaintiff's hostile work environment claim timely was not sexual in nature and thus was not a "part of the same actionable hostile work environment practice" that included the untimely gender-related conduct).

Brogdon claims that her hostile work environment claim is timely because Jefferson made the comments regarding her unhappiness on June 30, 2021, within 180 days of her filing the EEOC Charge on October 15, 2021. [Doc. 149 at 28 n.17]. As the Court found above, Brogdon has not pointed to evidence showing that these comments were based on her sex. Therefore, this act cannot be considered as part

of the same unlawful employment practice that makes up the remaining basis for the hostile work environment claim. *Menefee*, 137 F. App'x at 233–34.

Brogdon testified that her work environment generally was hostile after the female paralegal accused the male colleague of sexual harassment. Both came to Brogdon separately on multiple occasions in 2018 and 2019 to complain about the situation and the subsequent investigation, and Brogdon did not like that she "had to . . . deal with the fact that they were making complaints that [she] had no way to resolve" because Jefferson was "responsible for the work environment, not [her]." [Brogdon Dep. at 146–49]. In the fall of 2018, following the investigation, Jefferson directed Brogdon to "nip in the bud" the complaints the female paralegal was making about the investigation, and Brogdon testified "that was hostile to [her (i.e., Brogdon)]." [*Id.* at 111–15, 145–46]. Brogdon testified that she also had to deal with the fallout of separating out the work of the female paralegal and the male colleague when they were instructed not to work together. [*Id.* at 146]. All of this evidence relates to events and conduct that occurred in 2018 and 2019, and Brogdon did not file her EEOC Charge until years later on October 15, 2021.

The only other sex-based conduct that Brogdon claims contributed to the hostile work environment was Jefferson calling a lawyer in the community a "slut."

[Brogdon Dep. at 132–34]. But Brogdon admitted in her deposition that this conduct occurred before 2018. [*Id.* at 134].

Because no sex-based act purportedly contributing to the hostile work environment occurred within the 180-day time period preceding Brogdon's EEOC Charge, the hostile work environment claim is time-barred.

For all of the above reasons, I will grant summary judgment on Brogdon's hostile work environment claim in Count Two of the First Amended Complaint.[22]

## C. Retaliation

In Counts Three and Five of the First Amended Complaint, Brogdon brings retaliation claims under Title VII and 42 U.S.C. § 1981. [Am. Compl. ¶¶ 123–32, 143–51]. Brogdon alleges that she engaged in the following protected conduct: complaining internally to HR about race and sex discrimination and retaliation on July 6, 2021, later filing an EEOC Charge alleging race and sex discrimination, retaliation, and hostile work environment on October 15, 2021, and filing an

---

[22] Brogdon appears to try to recast her hostile work environment claim as a retaliatory hostile work environment claim. [Doc. 149 at 24]. This attempt by Brogdon to assert a new claim is barred because she cannot raise new claims at the summary judgment stage. *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1338 (11th Cir. 2024); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

Amended EEOC Charge on November 11, 2021.[23]  [*Id.* ¶¶ 124, 145].  Brogdon also allegedly sent written objections to the findings of the Payne Report.  [*Id.*].  In her First Amended Complaint, Brogdon alleges that Defendants retaliated against her by (1) failing to promote her, (2) performing a sham investigation, (3) subjecting her to false accusations, unwarranted discipline, and reputational damage, and (4) terminating her employment.  [*Id.* ¶¶ 126, 146].

### 1. Brogdon's Retaliation Claims Fails Under McDonnell Douglas.

Under the framework set out in *McDonnell Douglas*, a plaintiff must first establish a prima facie case through facts adequate to permit an inference of retaliation.  *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016).  A plaintiff may establish a prima facie case of retaliation by demonstrating that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.  *Id.*  "The third element requires a showing of but-for causation."  *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("*Nassar*")).  "[C]lose temporal

---

[23] Brogdon alleges in her First Amended Complaint that she verbally opposed Grady's racially discriminatory refusal to promote Black people to leadership and verbally opposed the sexually discriminatory and hostile work environment.  [Am. Compl. ¶¶ 124, 145].  However, Brogdon fails to point to evidence of when she expressed this verbal opposition.  *See* [Doc. 149 at 25–26].

proximity between the statutorily protected activity and the adverse employment action can meet the causal requirement, but 'mere temporal proximity, without more, must be very close.'" *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1295 (11th Cir. 2021) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).

If a plaintiff makes out a prima facie case under the burden-shifting framework, the employer must articulate a nonretaliatory reason for the adverse employment action. *Tolar*, 997 F.3d at 1289. If the employer does so, the employee must demonstrate that the employer's proffered reason was a pretext for retaliation. *Id.*

"A reason is not pretext for retaliation unless it is shown both that the reason was false, and that retaliation was the real reason." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (internal marks and emphasis omitted). The plaintiff must address "that reason head on and rebut it." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022) (citation and internal quotation marks omitted). The plaintiff cannot rebut a reason "by simply quarreling with the wisdom of " it. *Id.* (citation and internal quotation marks omitted). Instead, she must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the justification. *Id.* (citation omitted). If the employer offers more than one

legitimate, nonretaliatory reason, the plaintiff must rebut each reason. *Chapman v. AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc).

### a. Failure to Promote

Here, Brogdon cannot show that Defendants retaliated against her by failing to promote her. As discussed previously, there was no decision not to promote Brogdon because no deputy general counsel position ever existed. Additionally, Jefferson communicated to Brogdon that a deputy general counsel position would not be created for her in September 2021 and February 2021 ***before*** Brogdon first engaged in protected conduct on July 6, 2021, when she complained to HR. Therefore, because Jefferson told Brogdon she would not get promoted before Brogdon engaged in protected conduct, the protected conduct could not have caused the decision not to create a deputy general counsel position for Brogdon. *Zamora v. Gainesville City Sch. Dist.*, No. 2:14-cv-21-WCO-JCF, 2015 WL 12852321, at *4 (N.D. Ga. Aug. 26, 2015) ("the protected conduct must occur before the adverse employment action") (emphasis omitted); *see also Sasser v. Ala. Dep't of Corrs.*, 373 F. Supp. 2d 1276, 1288 n.21 (M.D. Ala. 2005) ("[T]here could be no causal relationship between Plaintiff's protected activity and the claimed adverse employment action because the protected activity did not take place until after the alleged adverse employment action.").

65

### b. Sham Investigation

Brogdon claims that Defendants also retaliated against her by conducting a sham investigation of her internal complaint to HR. Before I address the evidence and arguments related to this claim, I first must point out, as Defendants do, that Brogdon "cites no authority . . . for the proposition that an employee can base a retaliation claim merely on her characterization of the quality of the investigation of her internal complaints." [Doc. 156 at 5]. Assuming, without deciding, that such a claim is legally permissible, this claim fails because Brogdon's assertion that the investigation was a sham lacks evidentiary support.

Brogdon argues that the investigation of her internal complaint was not independent or fair and impartial because Randy Gepp retained Payne to conduct the investigation and Gepp had led the investigation of the female paralegal's complaint of sexual harassment. According to Brogdon, she had complained to Jefferson that Gepp's interview of her in the sexual harassment investigation "was not properly conducted and appeared predetermined to find no wrongdoing." [Doc. 149 at 16 n.11]. Brogdon also argues that the investigation by Payne "dismissed her concerns, lacked foundation, ignored evidence, and drew unfair conclusions." [*Id.* at 26]. These arguments are without merit.

66

First, while Brogdon complains about Gepp's link to Payne's investigation and suggests that Gepp may have unfavorably influenced the investigation because of Brogdon's prior complaint to Jefferson regarding Gepp's interview approach in the sexual harassment investigation, Brogdon points to no evidence that Gepp knew Brogdon had complained about him.   Moreover, Payne testified that no one interfered with her investigation or told her what conclusions to draw [Payne Dep. at 170–71], and Brogdon has not pointed to any evidence to rebut this testimony or to otherwise show that the investigatory process was flawed or that it deviated from typical investigatory procedures in a retaliatory manner.

Next, while Brogdon argues that Defendants should not be allowed to rely on the Payne Report, Brogdon relies on it throughout her opposition to Defendants' summary judgment motion.  [Doc. 149 at 6, 7, 8, 11, 17, 18].  Brogdon cannot both argue against the Payne Report's legitimacy and use and then rely on and use the Payne Report herself.[24]

---

[24] Brogdon states in her brief that "[f]ully evaluating the Payne Report would require comparing it to Payne's interview notes, a fact-intensive inquiry." [Doc. 149 at 26].  Brogdon makes no effort to explain why she did not engage in this analysis prior to responding to the summary judgment motion.  Brogdon's speculation that Payne's interview notes might reveal issues with the report is insufficient to create a genuine issue of fact as to whether Payne's investigation and report are a sham.

Brogdon has failed to come forward with competent evidence demonstrating that Payne's investigation and reporting constituted a retaliatory adverse employment action. *See Lockett v. City of Atlanta, Ga.*, No. 1:21-cv-4406-ELR-JKL, 2023 WL 10475982, at *17 (N.D. Ga. Dec. 22, 2023) ("Ultimately, since Plaintiff has not offered any evidence or explanation for how the investigation was a sham or designed for a predetermined outcome, the undersigned cannot find it actionable."), *adopted by* 734 F. Supp. 3d 1345 (N.D. Ga. May 15, 2024).

Brogdon asserts in her opposition brief that "[a]ssuming arguendo that the Payne Report was fair and impartial, Grady cannot use the investigation as a basis to dismiss [her], but it has." [Doc. 149 at 16–17]. Brogdon cites no legal authority to support this assertion. The Eleventh Circuit has "held that where an employer relies on a report of an employee's alleged wrongdoing, the question is not whether the report is accurate, but rather whether the employer 'reasonably believed' that it was." *Gogel*, 967 F.3d at 1152 (quoting *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n.2 (11th Cir. 1989)). Therefore, even if Payne was not fair and impartial in conducting the investigation and preparing the Payne Report, Jefferson was still entitled to rely on the Payne Report in making the termination decision if he had an honest belief that the investigation was conducted properly and that the Payne Report was thorough and accurate. Here, there is no evidence that Jefferson believed the

68

Payne Report was anything other than a fair and impartial review of the facts and law pertaining to the claims Brogdon raised in her internal complaint.

Brogdon has not shown that the investigation was retaliatory, and Brogdon's challenges to the Payne Report and to Defendant's reliance upon the Payne Report are without merit.

### c. Termination

Assuming, without deciding, that Brogdon can make out a prima facie case of retaliation related to termination, Defendants have articulated five legitimate, nonretaliatory reasons for Brogdon's termination:

- Plaintiff used and disclosed the memorandum without permission;

- Jefferson lost trust and loyalty in Brogdon due to her misuse of the memorandum;

- Brogdon displayed poor judgment and unethical behavior by hiring Buckley Beal;

- Brogdon was having conflicts with her coworkers and outside counsel and had a negative attitude in the office; and

- Brogdon displayed racial animus when she told another employee that she "does not trust any white people."

[Doc. 130-2, Jefferson Dep. Ex. 25 (Doc. 130-2 at 115–17)].

Jefferson averred in his declaration that during his employment at Grady, no other OLA employee has ever (1) disclosed a privileged and confidential document to third parties without Grady's consent; (2) displayed disloyalty and engaged in behavior that caused distrust; (3) hired a law firm to pursue personal grievances while also defending Grady against litigation brought by that same firm; (4) had difficulty getting along with coworkers and outside counsel and created a negative work environment; *and* (5) exhibited racial animus.  [Jefferson Decl. ¶ 11] (emphasis added).

Here, Brogdon has made no attempt to rebut Defendants' fifth reason for terminating her employment.  *See generally* [Doc. 149].  She makes no mention whatsoever of Defendants' claim that Grady terminated her employment because she told another employee that she does not trust White people.  "A plaintiff's failure to rebut even one [nonretaliatory] reason is sufficient to warrant summary judgment." *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021) (citation and alterations omitted); *see also Chapman*, 229 F.3d at 1037 ("[A] plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that *each* of the employer's proffered nondiscriminatory reasons is pretextual.") (emphasis added).  By failing to address all of Grady's proffered reasons, Brogdon has lost this claim.

70

Additionally, Defendants expressly argued in their summary judgment brief that Brogdon cannot show that but for her protected activity, her employment would not have been terminated. [Doc. 137-1 at 19, 24, 30]. Brogdon also failed to respond to this argument in her opposition brief. *See generally* [Doc. 149]. For this reason, as well, the retaliatory termination claim fails.

### 2. Brogdon Fails to Create a Convincing Mosaic to Raise an Inference of Retaliation.

The *McDonnell Douglas* framework is not the only way that a plaintiff can prove retaliation. An employee can prove retaliation with circumstantial evidence so long as the evidence raises a reasonable inference of retaliatory intent. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023). This is referred to as the "convincing mosaic" framework. *Id.* The Eleventh Circuit has identified the following "three nonexclusive categories of circumstantial evidence that can raise a reasonable inference of unlawful conduct: evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; evidence of systematically better treatment of similarly situated employees; or evidence that the employer's justification for its action is pretextual." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023) (citing *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022)). "Whatever form the evidence takes, 'so long as [it] raises a reasonable inference' that the employer retaliated against the

employee, 'summary judgment is improper.'"  *Id.* (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).

Notably, that evidence still must satisfy the "but-for" standard of causation. *Nassar*, 570 U.S. at 360.  "The but-for standard asks whether a particular outcome would not have happened 'but for' the purported cause.  Stated another way, a plaintiff must prove that had she not [engaged in protected expression], she would not have been fired." *Yelling*, 82 F.4th at 1338 (citations and quotations omitted).

In this case, Brogdon does not make a "convincing mosaic" argument.  *See generally* [Doc. 149].  Moreover, Brogdon's failure to respond to Defendants' arguments regarding "but-for" causation defeats the convincing mosaic method of proof, too.  Nevertheless, I have reviewed the circumstantial evidence relied on by Brogdon and conclude that, even when viewed in a light most favorable to her, the evidence does not create an inference of intentional retaliation.

Brogdon points to evidence of suspicious timing—her employment being terminated four months following her internal complaint to HR, one month after her EEOC Charge, and six days after her Amended EEOC Charge.  It is undisputed, however, that Jefferson was seriously concerned about Brogdon's negative attitude and negative impact on the work environment **before** Brogdon filed the internal complaint, as evidenced by his comments during their June 30, 2021, meeting.

Brogdon may disagree with Jefferson's view that she was negatively impacting the work environment, but she has presented no evidence to show that Jefferson did not honestly believe that Brogdon was creating a negative work environment. *See Alvarez v. Royal Atl. Devs.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (finding plaintiff's pretext argument failed because he "offered no probative evidence to challenge" defendant's asserted belief in allegations of plaintiff's misconduct).

Moreover, Brogdon's internal complaint, made four months before her employment was terminated, does not establish temporal proximity because four months is a duration that courts have held negates a temporal causal connection. *See Thomas*, 506 F.3d at 1364. Likewise, Brogdon cannot rely on the filing of her EEOC Charge in October 2021 to demonstrate a causal connection based on temporal proximity because the EEOC Charge was largely a recitation of her July internal complaint. *See Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 428 n.23 (5th Cir.

2017) ("[A] Title VII claimant cannot, with each protected activity, re-start 'the temporal-proximity clock.'").

Additionally, "the intervening discovery of employee misconduct can sever the causal inference created by close temporal proximity." *Berry*, 84 F.4th at 1309. Here, it is undisputed that after Brogdon made her internal complaint and filed her EEOC Charge, intervening events occurred that Grady contends supported or justified the termination decision. First, the Payne Report was issued, which revealed and concluded, among other things, that (1) Brogdon's allegations lacked supporting facts and/or did not meet applicable legal standards, (2) Brogdon was either not credible in some of her assertions and/or Brogdon did not know what she was talking about, (3) Brogdon's belief that Jefferson's memorandum was not privileged was incorrect and seemed to be disingenuous; and (4) Brogdon had allegedly told a coworker that she did not trust any White people and emphasized that she meant *any* White people. [Doc. 132-1, Payne Dep. Ex. A (Doc. 132-1 at 263, 270–71, 291–92)]. Moreover, during that time, Jefferson learned about Brogdon's retention of Buckley Beal, a firm that was adverse to Grady on a matter that was assigned to Brogdon. [Doc. 130-2, Jefferson Dep. Ex. 25 (Doc. 130-2 at 116)]. Jefferson provided testimony that he believed Brogdon's retention of Buckley Beal was a potential conflict of interest and displayed poor judgment. [*Id.*]. In her

response to the summary judgment motion, Brogdon does not address Defendants' argument that intervening events severed any causal inference created by the close temporal proximity between Brogdon's EEOC Charge and her termination. *See generally* [Doc. 149]. Thus, Brogdon has conceded this point. *Bonte*, 624 F.3d at 466.

Brogdon also attempts to paint Jefferson as a comparator, focusing only on the fact that they both shared the memorandum with their respective personal attorneys. [Doc. 149 at 20]. To establish an inference of retaliatory intent using comparator evidence, Brogdon must show that she and Jefferson were "similarly situated in all material respects." *See Lewis*, 918 F.3d at 1224 (internal quotation marks omitted). Brogdon has not made this showing. Brogdon and Jefferson did not have the same job or job responsibilities; Jefferson was an executive, while she was an employee. [Doc. 149 at 2]. Brogdon and Jefferson also did not share a supervisor. Indeed, Jefferson was Brogdon's supervisor, and Jefferson reported to Haupert and Grady's Board of Directors, which Brogdon also acknowledged in her opposition brief. [*Id.* at 3–4]. Additionally, Brogdon's conduct and Jefferson's conduct were not the same. Brogdon did not just share the memorandum with her personal attorney. She shared it with a firm that was adverse to Grady with respect to a matter on which Brogdon was the assigned in-house Grady attorney. There is

no evidence that any such conflict existed with Jefferson's personal attorney. Furthermore, while Brogdon focuses on the sharing of the memorandum, Defendants presented other reasons for Brogdon's termination that distinguish her conduct from Jefferson's conduct, including that Brogdon was having conflicts with her coworkers and outside counsel and had a negative attitude in the office, and that Brogdon displayed racial animus when she made a discriminatory comment to a coworker about not trusting any White people. Based on the foregoing, Brogdon cannot show that there was better treatment of a similarly situated employee, and she certainly has not presented evidence of systematically better treatment of similarly situated employees.

Brogdon finally argues that in the memo recommending her termination, Jefferson explicitly referenced her internal complaint to HR and the serious allegations she had raised. [Doc. 149 at 11, 18, 27]. Unlawful intent arguably could be inferred from these references, but the memo itself indicates that Jefferson's issue was not that Brogdon filed an internal complaint raising concerns; rather, his issue was losing trust in Brogdon because some of her allegations lacked a factual basis, such as Brogdon's claims that he selected her as his successor and that she should have become deputy general counsel. [Doc. 130-2, Jefferson Dep. Ex. 25 (Doc. 130-2 at 115)]. Jefferson opined in the memo that Brogdon must have known that no

deputy general counsel position existed and that he lacked authority to select a successor. [*Id.*]. In any event, as stated above, Jefferson had other reasons for terminating Brogdon, and at least one of those reasons—Brogdon's discriminatory animus—is completely unrebutted. In these circumstances, Brogdon has not raised a reasonable inference that Defendants retaliated against her, and she has not shown that she would not have been terminated but for her protected conduct.

For all these reasons, I will grant summary judgment with respect to Brogdon's retaliation claims set forth in Counts Three and Five of the First Amended Complaint.

## VI.   <u>CONCLUSION</u>

Based on the foregoing, I **GRANT** Defendants' Motion for Summary Judgment [Doc. 137] and **GRANT IN PART** Defendant Grady's Motion in Limine [Doc. 138].

**SO ORDERED**, this 28th day of March, 2025.

Catherine M. Salinas
United States Magistrate Judge